STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MARIA ELENA STITELER (Cal. Bar No. 296086)
Assistant United States Attorney
International Narcotics, Money Laundering,
& Racketeering Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-6148
    Facsimile:  (213) 894-0141
    E-mail:  maria.stiteler@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 21-459-SB |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION CONCERNING DEFENDANT CHRISTOPHER KAHMANN |
| v. | |
| CHRISTOPHER KAHMANN, | |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Maria Elena Stiteler, files its sentencing position concerning defendant Christopher Kahmann.

    This sentencing position is based upon the attached memorandum of points and authorities and supporting exhibit (filed under seal); the files and records in this case, including the United States Probation Office's Presentence Investigation Report and

Recommendation Letter; and such further evidence and argument as the Court may permit. The United States respectfully requests the opportunity to respond to defendant as may become necessary and if additional information becomes available.

Dated: September 6, 2022        Respectfully submitted,

STEPHANIE S. CHRISTENSEN
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

 /s/ *Maria Elena Stiteler*
MARIA ELENA STITELER
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

Defendant Christopher Kahmann was a police officer for 20 years, sworn to uphold the law and protect the public. But defendant did not believe the laws applied to him. He knew it was illegal to possess firearm silencers, yet possessed or sought to possess three such silencers. And he knew child pornography was illegal, yet used his phone to search for, access, and save images of child pornography.

The parties have entered into a binding plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C), pursuant to which defendant pleaded guilty to two counts of the Indictment: Count Two, which charges defendant with possession of an unregistered firearm (namely, a firearm silencer), in violation of 26 U.S.C. § 5861(d), and Count Eight, which charges defendant with accessing with intent to view child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2). In return, the government has agreed to dismiss the remaining counts of the Indictment against defendant, including Count Six, which charges defendant for receipt of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2)(A), (b)(1), and which carries a five-year mandatory minimum term of imprisonment.

In the binding plea agreement, the parties agreed that a Guidelines sentence of 46 to 57 months is appropriate here, taking into account the factors listed in 18 U.S.C. § 3553(a). In the Presentence Investigation Report ("PSR"), the United States Probation & Pretrial Services Office ("USPO") calculated a total offense level of 23 and a criminal history category of I, resulting in a Guidelines range of 46 to 57 months' imprisonment. (Dkt. 39 (PSR).) The USPO recommended that the Court impose a sentence of: (1) a term of 46 months' imprisonment, at the low-end of the Guidelines range; (2) a ten-year term of supervised release; (3) a mandatory special assessment of $200; and (4) $5,000 in restitution to the victim "Henley." (Dkt. 38 ("Recomm. Letter").)

For the reasons set forth below, the government concurs with the USPO's calculations, which are consistent with the plea agreement, but disagrees with its

recommendation. A sentence of 51 months – approximately the mid-point of the Guidelines range – is necessary to reflect the seriousness of the offenses; to promote respect for the law; to deter defendant and others from unlawfully possessing firearms and receiving and possessing child sexual abuse material; and to protect the public from defendant upon his release.

## II. DEFENDANT'S CONDUCT

Defendant was a police officer for many years, pledged to enforce laws and protect the public. Despite this, he knowingly broke the law by importing, receiving, and possessing illegal firearm silencers and child pornography.

### A. Defendant's Illegal Importation and Possession of Firearm Silencers

As described in the plea agreement, on November 4, 2019, defendant used an online marketplace called "Wish.com" to search for and illegally purchase a firearm silencer from a manufacturer in China. (PSR ¶ 18; Dkt. 31 ("Plea Agreement") ¶ 20.) This item, which had a marked end cap for drilling, could be converted into a firearm silencer and could not be lawfully imported into the United States without permission. (Id.)

Customs and Border Protection officers working at the Los Angeles International Airport intercepted the parcel containing the illegal firearm silencer. (PSR ¶ 19; Plea Agreement ¶ 20.) The parcel was addressed to defendant's home in Santa Clarita, and the shipping manifest falsely listed the firearm silencer as a "fuel filter." (Id.) At no time did defendant ask for or receive authorization from the Attorney General to import a firearm silencer into the United States. (Id.)

On January 17, 2020, federal agents executed a search warrant at defendant's home in Santa Clarita, and found – in addition to the imported silencer – a silver firearm silencer and a black firearm silencer without serial numbers inside defendant's bedroom

gun safe. (PSR ¶ 20; Plea Agreement ¶ 20.) In addition to the firearm silencers, agents found 55 firearms at defendant's residence.[1]

During the search, agents also seized defendant's digital devices pursuant to a search warrant, including defendant's primary phone, a black iPhone XS. (Id.) Text messages on this phone showed that defendant knew he could not possess firearm silencers without permission from the federal government. For example, in one message, defendant advised about purchasing a firearm silencer (also called a suppressor) in Texas: "The biggest thing about getting a suppressor is getting the federal tax stamp. You have to figure out what one you want, get the serial number and all the info about it then fill out the forms and send in the forms with a check for $200 . . ." Defendant illegally possessed silencers despite knowing the law; indeed, one video on defendant's phone that appeared to be filmed at his residence showed a person (not fully visible onscreen) firing a weapon with a silencer attached.

B. **Defendant's Receipt and Possession of Child Sexual Abuse Materials**

The search of defendant's phones and computer revealed evidence of more than just firearm violations. Defendant also used these devices to access and possess child pornography.

Specifically, and as admitted in the plea agreement, beginning around March 2018, and continuing through January 17, 2020, defendant used cellular phones, including his black iPhone XS, to knowingly access Tumblr, a social media and blogging platform, to view images and video files of minors engaging in sexually explicit conduct. One of the videos that defendant accessed showed two children under the age of 12 engaged in sexually explicit conduct. (PSR ¶ 21; Plea Agreement ¶ 20.) Defendant's black iPhone XS also contained a hidden storage application that appeared to operate as a calculator but secretly concealed child pornography and child erotica.

---

[1] Although not all of these firearms were registered to defendant or his wife, with the exception of the silencers, the firearms found at defendant's residence did not appear to violate federal firearms laws.

(PSR ¶ 22; Plea Agreement ¶ 20.) Using the hidden storage application, defendant knowingly possessed at least 20 images of child pornography. (Id.)

In addition to child pornography, defendant's black iPhone XS also had a substantial amount of child erotica, and screenshots from his phone showed recent Tumblr searches for "littlepussy" and "littlepussylover."

### III.   THE PRESENTENCE INVESTIGATION REPORT

Consistent with the calculations in the plea agreement, the USPO calculated an offense level of 23 in the PSR as shown below:

<u>Count Two:</u>
| | | |
|---|---|---|
| Base Offense Level: | 18 | U.S.S.G. § 2K2.1(a)(5) |
| 3-7 Firearms: | +2 | U.S.S.G. § 2K2.1(b)(1)(A) |

<u>Count Eight:</u>
| | | |
|---|---|---|
| Base Offense Level: | 18 | U.S.S.G. § 2G2.2(a)(1) |
| Prepubescent Victim: | +2 | U.S.S.G. § 2G2.2(b)(2) |
| Use of a Computer: | +2 | U.S.S.G. § 2G2.2(b)(6) |
| Between 10 and 150 Images: | +2 | U.S.S.G. § 2G2.2(b)(7)(A) |

<u>Combined Offense Level:</u>
| | | |
|---|---|---|
| 1 to 4 Levels Less Serious: | +2 | U.S.S.G. § 3D1.4(a) |
| Acceptance of Responsibility: | -3 | U.S.S.G. § 3E1.1(b) |
| <u>Total Offense Level:</u> | 23 | |

(PSR ¶¶ 30-61; Plea Agreement ¶ 22.) The USPO determined that defendant is in Criminal History Category I with a criminal history score of zero, resulting in a Guidelines range of 151-188 months. (PSR ¶¶ 66, 107.)

Based on these calculations, the USPO recommended a low-end sentence of 46 months, a ten-year period of supervised release, a $200 mandatory special assessment, and $5,000 in restitution to victim "Henley," to be paid in full immediately. (Recomm.

Ltr. at 1-2.) The USPO also recommended that the $17,000 special assessment and all fines be waived. (Id. at 2.)

## IV. THE GOVERNMENT'S SENTENCING RECOMMENDATION

Defendant was a police officer for 20 years. While serving as an officer, defendant broke the law and illegally sought and possessed silencers and child pornography, despite his duty to enforce the law and protect the public. Through his actions, defendant showed that he did not believe the law applied to him. Defendant breached the public's trust in him. Accordingly, the government concurs with the Guidelines calculations and criminal history computation set forth in the PSR, but disagrees with the USPO's recommended 46 months' sentence. Instead, the government believes that a 51-month sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

The distribution of child pornography is not a victimless crime. It "is intrinsically related to the sexual abuse of children," both because "the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled," and because it constitutes a "permanent record of the children's participation and the harm to the child is exacerbated by their circulation." New York v. Ferber, 458 U.S. 747, 759 (1982). Crimes like defendant's guarantee that the underlying abuse is "in effect repeated" since the victim knows "her humiliation and hurt were and would be renewed into the future as an ever-increasing number of wrongdoers witnessed the crimes committed against her." Paroline v. United States, 572 U.S. 434, 441 (2014).

Congress has explained the difficulties in successfully combating the "immense" problem of child pornography and the "rapidly-growing market" for such materials, which is fueled by new technologies that were largely unavailable when the Sentencing Guidelines were first promulgated. See S. Rep. No. 108-2 (2003). Indeed, despite the "pernicious evil" of the crime, S. Rep. No. 104-358, Congress has repeatedly expressed its dismay about the "excessive leniency" of federal sentences, H. Rep. No. 108-66,

5

especially in light of the "continuing harm" caused to the children appearing in such materials, as well as the inflammatory effect it has on the "desires of child molesters, pedophiles, and child pornographers," which results in a robust and growing market for child pornography and therefore increased abuse of innocent children, see Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26, 27 (1996), codified as amended at 18 U.S.C. § 2251.

Here, defendant had images and video frames of child pornography on multiple devices, including images saved in a hidden application. (Dkt. 42; PSR ¶¶ 22, 24.) To obtain images like this, defendant searched Tumblr for "littlepussy" and "littlepussylover." Defendant's actions were not an accident, but deliberate and deeply troubling conduct that helped grow the marketplace for this abhorrent contraband, thereby incentivizing other individuals to produce such content and harming some of the most vulnerable members of society: children.

Nor were defendant's crimes limited to child pornography. Defendant also knowingly and illegally possessed firearm silencers. And while defendant's illegal possession of firearm silencers did not, in this case, victimize others, illegal possession of silencers is nonetheless a danger to the public. Indeed, video from defendant's phone shows someone appearing to fire a firearm with a silencer attached on defendant's property (in a residential area), illustrating the danger that defendant's firearm crimes posed to the public.

This case does present mitigating circumstances. Defendant is Criminal History Category I, and he served the public as a police officer for many years. Further, as described in the PSR, defendant appeared suffer from mental health conditions around the time of his crimes. Accordingly, the government recommends a sentence of 51 months' imprisonment, approximately the middle of the Guidelines range. Such a sentence accounts for the mitigating and aggravating aspects of defendant's crimes and background, promotes respect for the law, provides adequate deterrence for defendant

and others who engage in these acts, and protects the public from future crimes of defendant.

## V. A TEN-YEAR TERM OF SUPERVISED RELEASE IS APPROPRIATE

The government agrees with the conditions of supervised release listed on pages two through six of the Probation Office's Recommendation Letter (Recomm. Ltr. at 2-6) and agrees that a ten-year term is appropriate here. As Congress explained when amending 18 U.S.C. § 3583,

> Studies have shown that sex offenders are four time more likely than other violent criminals to recommit their crimes. Moreover, the recidivism rates do not appreciably decline as offenders age . . . While any criminal's subsequent re-offending is of public concern, preventing sexual offenders from re-offending is particularly important, given the irrefutable and irreparable harm that these offenses cause victims and the fear they generate in the community.

H.R. Rep. 107-527.

## VI. VICTIMS AND THEIR IMPACT STATEMENTS

"Child pornography is a vile, heinous crime. Mention the term to your average American and he responds with immediate disgust and a sense of unease. However, once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement." United States v. Cunningham, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010).

Child pornography "is a form of sexual abuse which can result in physical and psychological harm, or both, to the children involved." Child Pornography Prevention Act of 1996, 1 Pub. L. No. 104-208, § 121, 110 Stat. 3009 (1996) (codified as amended at 18 U.S.C. § 2251). "[W]here children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years." Id.

Moreover, Congress found little distinction in the harm caused by a pedophile, be he a distributor or a mere consumer in child pornography, because the mere "existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children." § 121, 110 Stat. at 3009-27. "[I]t inflames the desires of child molesters, pedophiles, and child pornographers who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials." Id.

In December 2012, the United States Sentencing Commission submitted a comprehensive report to Congress on child pornography crimes including the harms experienced by child pornography victims. United States Sentencing Commission, Report to Congress: Federal Child Pornography Offenses, Ch. 5 Victims of Child Pornography (December 2012). The Commission explained that "[c]hild pornography victims face other types of victimization that are separate from the harm of production. Even after the physical abuse has ended, child pornography victims suffer due to continued circulation of their images or the ongoing potential for circulation of their images." Id. at 112. The Commission emphasized that, unlike child sex abuse victims whose abuse was not memorialized, child pornography victims experience a greater long-term risk of depression, guilt, poor self-esteem, feelings of inferiority, interpersonal problems, delinquency, substance abuse, suicidal thoughts, and post-traumatic stress disorder. Id. at 113.

Studies on victims of child pornography also indicate that the child's original psychological harm continues into adulthood and impacts their ability to form healthy relationships with others. John E.B. Myers, et al., The APSAC Handbook on Child Maltreatment (2d ed. 2002). The symptoms of distress exhibited by child victims of sexual abuse continue after the actual sexual exploitation to the time of disclosure and into the post-traumatic phase as well. Id. at 59-62. In cases of online child pornography,

Case 2:21-cr-00459-SB   Document 43   Filed 09/06/22   Page 11 of 12   Page ID #:334

where the crime is perpetuated by the continual circulation of the child's images, these symptoms of distress are likely to continue with each new distribution and possession.

The National Center for Missing and Exploited Children has also described the effects of child pornography on its victims:

> Because children are sexually abused in the creation of the pornographic images, they can incur physical injuries such as genital bruising, cuts, lacerations and sexually transmitted diseases. The children may suffer psychological injuries including depression, anger, withdrawal, low self-esteem and feelings of worthlessness. These feelings may be expressed in flash-backs, nightmares and other indicia of post-traumatic stress syndrome. They often engage in self-destructive behavior including substance abuse, prostitution, depression and suicide.
>
> When the pornographic images are viewed by others, the children depicted are victimized once again. The mere knowledge that images exist and are being circulated causes shame, humiliation and powerlessness. This victimization lasts forever since the pictures can resurface at any time, and this circulation has grown exponentially because of the Internet. As one expert explained: "The victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child." At a more fundamental level, child pornography victims' rights of privacy and human dignity are violated when their images are circulated and viewed by others. The possessor thus has real victims and inflicts actual harm upon them by his conduct.

Professor Audrey Rogers, <u>Child Pornography's Forgotten Victims</u>, 28 Pace L.Rev. 847, 853–54 (2008) (footnotes omitted).

Attached under seal as Exhibit 1 is a victim impact statement that the government received from a victim in this case. This statement describes the ongoing harm and victimization faced by this victim and her family. For example, she explains how the effects of her abuse follow her, and how helpless and powerless she feels, knowing she cannot remove her photos or videos from the internet. She describes her insecurities, her inability to trust, her anxiety attacks stemming from PTSD, and her fear that people she knows have seen her images online. She describes having to change her name due to the distribution of his images on the internet, and explains that she cannot own property in

9

her name and finds it hard to get her drivers' license or open a bank account due to the need to protect her identity from pedophiles who have seen her images online. She writes "I feel guilt and shame . . . I still feel like a child, trapped, powerless, paralyzed, unable to stop or prevent the ongoing abuse." Her voice, and that of other victims, should not be "sterilize[ed]." Their emotions should not play second fiddle to the defendant's emotions. The Court should impose the meaningful sentence requested.

## VII. CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court impose a sentence of: (1) 51 months of imprisonment; (2) a ten-year period of supervised release with the terms outlined in the Recommendation Letter; (3) a $200 mandatory special assessment; and (4) restitution in the amount of $5,000 to Deborah A. Bianco, in trust for "Henley."